UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Wendy F. Davis,                                        Case No. 3:22-cv-301

        Plaintiff,

    v.                                                 MEMORANDUM OPINION
                                                       AND ORDER

University of Toledo,

        Defendant.


## I.     INTRODUCTION

Defendant University of Toledo filed a motion for summary judgment.  (Doc. No. 39).

Plaintiff Wendy F. Davis opposed that motion.  (Doc. No. 43).  The University filed a brief in reply.

(Doc. No. 45).  For the reasons that follow, I grant the University's motion.

## II.     BACKGROUND

Davis worked in the University of Toledo Human Resources Department from 2015 until

she was fired in September of 2020.  When she was first hired, she served as Director of Human

Resources for Academic Administration and Student Services.  (Doc. No. 36-1; Doc. No. 36 at 47).

A year later, she was promoted to the role of Interim Associate Vice President of Human Resources

and Talent Development.  (Doc. No. 36-2).  On June 22, 2017, her interim status was removed, and

she was promoted to Associate Vice President of Human Resources and Talent Development.

(Doc. No. 36-3).  In November of 2018, her title was changed to Chief Human Resource Officer

(CHRO), though her job responsibilities stayed the same.  (*See* Doc. No. 36-4; Doc. No. 36 at 84-

86).

As CHRO, Davis was responsible for the entire Human Resources Department at the University.  (*See* Doc. No. 36-4 at 1).  Her job encompassed "the development and implementation of policies touching all of the human resources functional areas including: recruitment and employment services; compensation; classification, and benefits administration; training and development; labor and employee relations; employee disability and leave administration; [and] human resources information systems."  (*Id.*).  As CHRO, Davis was "the appointing authority for the university"—meaning she had hiring and firing power—and managed "all functions of the Human Resources and Talent Development team."  (*Id.* at 1-2).  Davis was also responsible for balancing the departmental budget and for "recruitment and maintenance" of the University's labor force.  (*Id.* at 2).  She supervised seven employees directly and oversaw between forty and fifty human resources employees.  (Doc. No. 36 at 83; Doc. No. 37 at 123-24).  The CHRO reports to the Executive Vice President for Finance, who is effectively the University's chief financial officer.  (*See* Doc. No. 38 at 11).

When Davis took over as CHRO, she "had hesitation" because the previous CHRO, Jovita Thomas-Williams, "came in and she blew up all the processes but didn't have time to put them back together," and Davis knew "part of [her] role" would be to fix the "significant issues" in the Human Resources Department.  (Doc. No. 36 at 110; *see* Doc. No. 37 at 82).  But Kelley asked her to take the position, and she agreed.  (Doc. No. 37 at 81-82).

On January 1, 2019, Matt Schroeder, who previously had served as the University's Chief of Staff, took over as Executive Vice President for Finance.  (Doc. No. 38 at 24-25).  As a result, Davis began reporting to him.  (Doc. No. 36 at 66).  Schroeder reported directly to the President of the University, who, at the time, was Dr. Sharon Gaber.  (*See* Doc. No. 38 at 20).

In June of 2019, Davis received an annual performance evaluation from Schroeder.  (Doc. No. 38-18).  Performance evaluations are typically conducted in the spring or early summer of a

given fiscal year.  (*See* Doc. No. 38 at 64).  The evaluation contains two rubrics: "Overall UT Work Values and Behaviors," which examines abstract behavioral and personal qualities like "conflict management" and "supervisory courage," and "Specific Work Values and Behaviors," which examines more concrete job goals tied to a person's position, like "implement marketing and cost savings plan for health care benefits."  (Doc. No. 38-18).  It also contains an overall assessment.  (*See id.*).

The evaluating supervisor uses a 1 ("Unsatisfactory") to 5 ("Frequently Exceeds") scale to assess both overall performance and the two rubrics.  (*Id.*).  Schroeder gave Davis a "Frequently Exceeds" rating for the "Overall UT Work Values and Behaviors" category, and a "Meets Expectations" rating for the "Specific Work Values and Behaviors" category.  (*Id.*).  Davis's final rating overall was "Meets Expectations."  (*Id.*).

In late August of 2019, the University completed an audit of its compliance with federal requirements regarding the collection and retention of I-9 forms from hired employees in order to verify those employees' identity and employment eligibility.  (*See* Doc. No. 38 at 60; Doc. No. 36-14 at 1).  Davis acknowledged that "the ball got dropped" regarding I-9 collection and retention issues around the time Davis replaced Thomas-Williams in the CHRO role.  (Doc. No. 36 at 224).  Nevertheless, Davis had initiated the audit before Schroeder began supervising her because of her concerns about the United States Department of Labor "ramping up" its enforcement of I-9 requirements.  (*Id.*).  Two of Davis's direct subordinates at that time, Terrie Kovacs and Carolyn Chapman, were responsible for the collection and maintenance of I-9 forms.  (*Id.* at 227).

The audit examined the records of two random samples of employees, one in August of 2018 and the other in April of 2019.  (*See* Doc. No. 36-14 at 2).  In the first sample, 32% of I-9 forms were missing.  (*Id.*).  In the second, 20% of I-9 forms were missing.  (*Id.*).  Extrapolating these percentages university-wide, and accounting for the variation in possible fine amounts, the audit

report concluded that the University's failure to collect I-9 forms exposed it to between $595,240 and $9,491,172 in fines.  (*See id.*).  The audit provided recommendations for areas of improvement, and Davis, in her capacity as CHRO, responded with proposed solutions.  (*See id.* at 3-4).

Thereafter, Davis says she proposed one specific measure to respond to the I-9 issues: expanding the University's use of Intellicorp, a vendor used to perform background checks, to process and review I-9 forms as well.  (*See* Doc. No. 36 at 145).  She says Schroeder denied this request, though he does not recall doing so.  (*Compare id. with* Doc. No. 38 at 116).  The University adopted the use of Intellicorp to process I-9s after Davis's departure.  (Doc. No. 38 at 116).

Later that year, the auditing department itself came under scrutiny.  The University conducted a once-every-five-years external Quality Assessment Review of its Internal Audit and Compliance Department ("IA Department"), and in November of 2019, the Quality Assessment Review concluded the Department failed to "generally conform[]" with the Institute of Internal Auditors International Standards for the Professional Practice of Internal Auditing.  (Doc. No. 38-13 at 1).  The IA Department head, David Cutri, also reported to Schroeder, and Schroeder issued him a written reprimand and placed him on a performance improvement plan.  (*See id.*; Doc. No. 38 at 164-65).

The plan called for a 60-day period of review with bi-weekly one-on-one meetings to monitor Cutri's progress.  (*Id.*).  It also cited five areas for improvement: "Cultivate IA's strategic and independent outlook," "[e]nhance internal audit capabilities in specialized areas," "[e]volve the alignment of IA's activities with key risks," "[i]mprove IA's reporting and communication processes," and "[e]valuate performance on an ongoing basis."  (Doc. No. 38-13 at 5-9).  As Schroeder explained, the nub of the problem was the IA Department's decision to focus only on entities formally within the University, and to exclude "subsidiaries" that were "at arms length" to the University proper but were nevertheless part of the University system, like the University's

foundation and the University of Toledo Physicians Group.  (Doc. No. 38 at 169-70).  So, fixing the issues identified in the Quality Assessment Review involved taking more responsibility for auditing those entities, among other things—and Cutri "ended up working through the PIP in a very efficient manner."  (*Id.* at 171).

In early 2020, the University undertook the renegotiation of its collective bargaining agreement with the Fraternal Order of Police, which provides the University with some of its security services.  (*See* Doc. No. 38 at 67).  Davis, and the labor relations team working under her, took primary responsibility for the day-to-day negotiations.  (*See* Doc. No. 36 at 189-93; Doc. No. 38 at 68-70).  This process produced an initial tentative agreement, which Lisa Simpson, one of Davis's direct subordinates, approved for submission to Schroeder.  (*See* Doc. No. 38 at 190, 192).  Ordinarily, Schroeder would conduct a final review and then submit the tentative agreement to the board for final approval.  (*See id.* at 189-90).  But Simpson failed to accurately calculate the final cost of the proposal, a step Davis instructed her to take but later "found out" that "she didn't."  (Doc. No. 36 at 190).  Simpson's failure to "do[] the figures" resulted in a tentative agreement—signed by union representatives—that was "more than what the University wanted to pay."  (Doc. No. 36 at 190, 192).

Once Schroeder discovered this issue, he directed Davis and the others involved in the collective bargaining process to go "back to the table [to] ask the union to renegotiate" the first, tentative agreement, which the union agreed to do.  (*Id.* at 191).  The redrafted tentative agreement also had issues: it, too, exceeded "[t]he parameters that . . . were given" to Davis and her team in the Human Resources department for how much the agreement should cost.  (*Id.* at 196; *see* Doc. Nos. 36-8 and 36-9).  Specifically, Schroeder concluded the "percent increase and description of what was being offered to the union was incorrect and out of line with other collective bargaining agreements."  (Doc. No. 38 at 70).  Schroeder stated as much in an email exchange with Davis at the

end of March and beginning of April 2020, where he doubted the "proposed economics" of the agreement and identified eight areas in Davis's analysis of the proposal that raised questions or did not make sense. (Doc. No. 36-8).

After Davis provided responses, Schroeder rejected the revised tentative agreement, stating he "cannot take [it] to the Board" because it "does not align with the economics in other CBAs" and would harm the University's "fiscal health." (Doc. No. 36-9). Davis says she discussed these issues with Schroeder before he sent his emails raising concerns about the revised tentative agreement. (Doc. No. 36 at 193-97). Davis indicated she "probably" bore responsibility for Simpson's mistakes because "[Simpson] was a part of HR, and I'm over HR." (Doc. No. 36 at 200).

In April of 2020, the University undertook temporary layoffs because of the financial and logistical strain of the initial wave of the COVID-19 pandemic. (*See* Doc. No. 38 at 124; Doc. No. 37 at 87). As Schroeder recalls it, those furloughs required "direction and paperwork coming from HR to instruct" the payroll department "what to do." (*Id.* at 123; *see* Doc. No. 37 at 88). But because of "errors and omissions" in the paperwork, which came amidst "ongoing issues between HR and payroll in terms of incomplete documentation," the temporary layoffs required a frustrating and extended back-and-forth between the two departments. (Doc. No. 38 at 123). From Davis's perspective, Schroeder gave inconsistent directives on which group of employees should be furloughed, requiring late nights and "tireless[]" work from her Human Resources staff to get the job done. (Doc. No. 36 at 147; Doc. No. 37 at 88).

On July 1, 2020, Gaber stepped down as President and was replaced, in an interim basis, by Dr. Gregory Postel. (Doc. No. 38 at 111). One of his "key initiatives" as Interim President "was the modernization of HR." (*Id.*). Specifically, Postel sought to "mitigate against the constant complaints regarding HR; establish accountability; establish systems, dashboards; improve overall customer service, meaning from the front lines of HR all the way up; to ensure compliance as it

relates to I-9s, FMLA, other areas; and the timely and accurate execution of deliverables on a day-in and day-out basis." (*Id.* at 58).

Five days after Postel's accession as President, the University completed an audit of its FMLA compliance. (Doc. No. 36-15 at 2). Unlike the I-9 audit, this one found no FMLA violations in the sample of FMLA requests it evaluated. (*See id.*). Nevertheless, it concluded that "internal controls need improvement" and provided eight recommendations. (*Id.*).

Those recommendations were: (1) ensuring employees seeking maternity leave were not erroneously prompted to request a certification from their health care provider; (2) ensuring that new employees are provided information about the FMLA during orientation; (3) implementing procedures to ensure employees on FMLA leave provide fitness-for-duty certifications; (4) ensuring that the University's online application for FMLA leave prepopulates with the correct hire date; (5) ensuring the University's online system for tracking FMLA leave accurately reflects the amount of leave an employee has taken; (6) distributing a checklist of standard operating procedures to supervisors; (7) establishing controls to ensure spouses employed by the University are jointly limited to twelve weeks of FMLA leave; and (8) including FMLA compliance in the Human Resources strategic planning process. (*Id.* at 3-7). In making several of these recommendations, the audit noted that certain weaknesses in the University's FMLA compliance scheme put it "at risk" of liability or noncompliance. (*See id.* at 3-4). Like she did for the I-9 audit, Davis provided responses addressing these recommendations. (*See id.* at 3-7).

At around this same time, the University of Toledo Medical Center ("UTMC") was struggling to fill open positions, maintaining a 10% vacancy rate. (*See* Doc. No. 36 at 184-86). On July 14, 2020, Rick Swaine, the CEO of UTMC, met with Davis and Chapman to address these ongoing issues, including a "significant" decrease in applicants for open positions there. (Doc. No. 36 at 184-86; Doc. No. 36-7). A few weeks later, in early August, UTMC leadership again expressed

frustration with the Human Resources Department's tardy efforts to post and fill open positions. (Doc. No. 36-18; *see* Doc. No. 36-17; Doc. No. 36 at 98).

Later in August, Schroeder received feedback from Brian Pack, a former Human Resources employee who had reported directly to Davis, citing Davis's lack of "flexibility" and "respect" as contributing to Pack's decision to leave the University. (Doc. No. 36-19). Of Davis's seven direct subordinates, Pack was one of four who resigned in a 13-month period, and they all cited issues with Davis's leadership and management in doing so. (*See* Doc. No. 38 at 89-92; Doc. No. 38-4 at 3).

That same month, August of 2020, Davis expressed frustration to Schroeder over the high turnover in the Human Resources Department and over Schroeder's perceived mistreatment of her. (Doc. No. 37 at 80). In Davis's view, Schroeder "consistently said no" when she "ask[ed] for things that [she] need[ed] to run the department," and the department suffered because Schroeder refused to provide her with the necessary resources to run it properly. (*Id.* at 80-81). She told Schroeder she had been "hesitant" to take the CHRO role because of the "massive" amount of work it would entail, but the people in the Human Resources Department "deserved someone who was going to come in there and help fix things." (*Id.* at 82). She told Schroeder that she was thinking of resigning, but she "wanted to stick in there" and "wanted to finish what [she] started." (*Id.*). So, she did not resign. (*See id.* at 80-82).

Around this time, Postel introduced Schroeder to Melissa Hurst and John Elliott, two colleagues of Postel's from prior jobs. (Doc. No. 38 at 107). Neither is African American. Elliott worked with Postel at the University of Louisville, and Hurst had worked in executive recruitment at Korn Ferry, a professional recruiting firm. (*See id.*). Schroeder was instructed to meet with Elliott "to see if he could be a fit" at the University, and he was instructed to meet with Hurst for the same reason. (*Id.* at 109). Elliott had been recommended to Schroeder because he was "excellent at

turning around organizations," and Hurst had been recommended because of her "executive search and recruitment" and "talent development" skills.  (*Id.*).

Schroeder did not involve Davis in these meetings because, by that point, he had decided that "the next chapter of HR . . . did not involve" Davis, given Postel's "objective of modernizing HR" and the "18 months of struggles within HR."  (Doc. No. 38 at 110).  Schroeder made the decision to terminate Davis in consultation with the Legal Department and Postel.  (*Id.* at 55).  He did not offer her a performance improvement plan or discuss demoting or retraining her.  (*Id.* at 57).  Davis also did not receive a performance evaluation for that fiscal year from Schroeder, as she had the previous June.  (*See* Doc. No. 38 at 63; Doc. No. 36 at 139).

On September 4, 2020, prior to informing Davis of her termination, Schroeder hired Elliott as Chief Human Resources Officer on a two-year contract.  (*See* Doc. No. 38-11; Doc. No. 38 at 94-95).  Four days later, Schroeder hired Hurst on a two-year contract as the Executive Director of Talent Strategy and Development, a position that focused on "talent acquisition and development," including some executive search responsibilities.  (Doc. No. 38-9; *see* Doc. No. 38 at 96-97).  Elliott made a little more than $250,000 per year, and Hurst made a little more than $200,000 per year; both figures were greater than Davis's salary when she was fired.  (*See* Doc. No. 38 at 147-48).

On September 18, 2020, Davis arrived at Schroeder's office for her biweekly, one-on-one meeting "under the assumption" they "were going to have a conversation" like they usually did.  (Doc. No. 36 at 104).  Instead, Schroeder informed Davis in person, and with a contemporaneous written letter, that he was terminating her employment, effective in 90 days.  (*See* Doc. No. 36-6; Doc. No. 36 at 103).  During this conversation, Schroeder informed her the University had "decided to go in a different direction" with the leadership of the Human Resource department and that she would be responsible for onboarding her replacement.  (*Id.* at 105).

On October 13, 2020, Davis filed an administrative charge with the Ohio Civil Rights Commission asserting discrimination on the basis of "Race/Color" and "Sex." (Doc. No. 37-1 at 1). On December 1, 2020, she filed an amended charge asserting "Race/Color," "Sex," and "Age" as bases for the University's alleged discrimination. (Doc. No. 37-2). The OCRC issued her a Letter of Determination on June 25, 2021, in which it found it "probable" that the University had discriminated against Davis on the basis of race and "not probable" that it had discriminated against her on the basis of age and sex. (Doc. No. 37-3 at 3). The University challenged the decision regarding race discrimination, and on July 22, 2021, the OCRC affirmed its earlier "probable" determination. (Doc. No. 37-4).

Davis sued the University on February 22, 2022, bringing five causes of action: (1) discrimination on the basis of race in violation of 42 U.S.C. § 2000e-2 (Title VII), (2) discrimination on the basis of race in violation of 42 U.S.C. § 1981, (3) retaliation in violation of 42 U.S.C. § 2000e-2 (Title VII), (4) retaliation in violation of 42 U.S.C. § 1981, and (5) an award of attorney's fees under 42 U.S.C. § 1988. (*See* Doc. No. 1). Davis voluntarily dismissed her two § 1981 claims (Doc. No. 12), and I granted the University's motion for partial judgment on the pleadings with respect to the § 1988 pleading. (Doc. No. 23).[1] The University seeks summary judgment on Davis's two remaining claims: discrimination on the basis of race under Title VII, and retaliation under Title VII.

### III. STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] The request for attorney's fees is denominated as "Count Three" in the complaint, which created the impression Davis meant to pursue a separate cause of action under 42 U.S.C. § 1988. (*See* Doc. No. 1 at 14-15). The University sought a ruling clarifying that Davis may not pursue a claim under 42 U.S.C. § 1988 "independent" of her four discrimination claims. (*See* Doc. No. 11 at 2). As I explained, "case law established Davis may not pursue a stand-alone claim under § 1988," but she "may seek relief under § 1988 if she ultimately is a prevailing party in this litigation." (Doc. No. 23 at 2).

56(a). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the [record] . . . ,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25.

Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. Gen. Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). But "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter.'" *Wiley v. United States*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249). Therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071.

The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, I must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## IV. ANALYSIS

### A. TITLE VII RACE DISCRIMINATION

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice" to "discriminate against any individual with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may show an employer's discriminatory treatment through direct evidence or circumstantial evidence. *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). Title VII claims based on circumstantial evidence, like the one here, "are analyzed under the familiar three-step framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021).

Under the first step of this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination by demonstrating that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Id.* (citation and quotation marks omitted).

Then, the burden shifts to the defendant to articulate a "legitimate, non-discriminatory reason for its actions, supported by admissible evidence that 'if believed by the trier of fact, would

12

support a finding that unlawful discrimination was not the cause of the employment action.'" *Id.*
(quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)) (additional citation omitted).
Finally, the burden shifts back to the plaintiff, who must "prove by a preponderance of the evidence
that the employer's proffered reasons were a mere pretext for discrimination." *Briggs*, 11 F.4th at
508-09 (citing *Wright*, 455 F.3d at 707-08).

The University concedes that Davis can establish a prima facie case of race discrimination.
(*See* Doc. No. 45 at 6).  The University says Schroeder fired her because Postel, the new University
President, made Human Resources modernization a key initiative, and Davis's performance issues
while under Schroeder's supervision made her unsuitable for the job at a time of "transformative
leadership under the new administration." (Doc. No. 39 at 19).  "[F]ailure to correct on-going
performance deficiencies" and "failure to meet reasonable expectations" are legitimate, non-
discriminatory reasons for a termination. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir.
2016).  Davis does not contest that the University has met its burden to articulate a legitimate,
nondiscriminatory reason for firing her.  (*See* Doc. No. 43 at 14).  But the parties dispute whether
Davis has created a genuine dispute of fact as to pretext.  (*See* Doc. No. 39 at 19-24; Doc. No. 43 at
14-18).

A plaintiff can establish pretext by showing that the proffered reason: "(1) had no basis in
fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the
adverse employment action." *Briggs*, 11 F.4th at 515 (citations and quotation marks omitted).  At
this third stage, the plaintiff "need not present independent evidence that the proffered reason is
pretext for racial discrimination," but "[she] must come forward with evidence that the defendant's
reason for the employment action is false." *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 615
(6th Cir. 2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, (2000)).  At the
pretext stage, the "ultimate inquiry" is: "did the employer fire the employee for the stated reason or

not?" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (citation and quotation marks omitted).

Davis does not argue her tenure as CHRO was spotless—as she conceded during her deposition, there were "some issues still remaining" in the Human Resources department when she was terminated. (Doc. No. 36 at 111). She has not shown, and has not attempted to show, there was no basis in fact for the University's proffered reason for firing her. (*See* Doc. No. 43 at 14-19).

Instead, she makes two other arguments. First, she argues that Schroeder sabotaged her ability to run the University's Human Resources Department by cutting her budget, denying her resources, and unreasonably rejecting her suggestions for how to improve things. (*See* Doc. No. 43 at 14-17). In substance, this is an argument that any inadequate performance on her part "did not actually motivate the adverse employment action," because Schroeder deliberately induced negative outcomes in the Human Resources Department to generate plausible cover for firing Davis. *Briggs*, 11 F.4th at 515. Second, she argues there is a genuine dispute as to pretext because Cutri, who ran the IA Department and was similarly situated to her, was placed on a performance improvement plan after his department failed an external audit rather than being summarily terminated. (*See* Doc. No. 43 at 16). This is an argument that any performance issues were "insufficient motivation" for her termination. *Briggs*, 11 F.4th at 515.

### 1. "Job Sabotage" Theory

A plaintiff seeking to show their employer's proffered reason for firing them "did not actually motivate" the decision "'admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal.'" *Russell v. Univ. of Toledo*, 537 F.3d 596, 606 (6th Cir. 2008) (quoting *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Instead, "the plaintiff attempts to indict the credibility of the employer's

explanation" through "the sheer weight of the circumstantial evidence of discrimination." *Manzer*, 29 F.3d at 1084.

Such an effort often utilizes conflicting evidence in the record regarding key events or background evidence of racial animus by other individuals. *See, e.g.*, *Wheat v. Fifth Third Bank*, 785 F.3d 230, 241 (6th Cir. 2015) (plaintiff's "vehement" denial he ever made the threat supposedly relied on by defendant for his termination created a genuine dispute over pretext); *Johnson*, 319 F.3d at 868 (supervisor's "concern that having an African–American comanager would have an adverse effect on the . . . store's business" contributed to a finding of a genuine dispute over pretext). It also may involve an inquiry into the reasonableness of the employer's decision. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003).

The circumstantial evidence to which Davis points does not demonstrate a genuine dispute of fact under her first theory of pretext. Viewing the record in the light most favorable to Davis, a jury could credit her deposition testimony that the Human Resources budget "was the budget that was probably affected the most." (Doc. No. 36 at 73). But Davis concedes that the University "consistently" cut the Human Resources Department budget "over the last four or five years" before her termination, including before Schroeder began to supervise her. (*Id.* at 72; *see also id.* at 220). As Schroeder testified, and as Davis does not contest, the University is "always trying to reduce its budget given declining enrollment." (Doc. No. 38 at 97). Davis does not explain how the continuation of a budgeting trend that began before Schroeder took over supervision of the Human Resources Department undermines "credibility of [her] employer's explanation" that it terminated her because of the proliferation of problems under Davis's leadership. *Manzer*, 29 F.3d 1084.

Moreover, although Davis suggests Schroeder was responsible for both the decision to cut her budget and the extent of that cut, the only evidence in the record regarding the budgeting process shows that the University of Toledo Board of Trustees must approve all proposed budgets

15

three times for a given fiscal year: two temporary budgets, and a final budget.  (*See* Doc. No. 38 at 97).  Davis points to no evidence Schroeder himself was the final decisionmaker with respect to the shrinking budgets she protests.

And as for the related argument that Schroeder "refused" Davis's "continu[ous] request[s] [for] additional resources," Davis does not cite to any record evidence to support this proposition. (Doc. No. 43 at 16).  Instead, she cites to the same portion of her deposition where she discusses the annual cuts to the Human Resources budget.  (*See id.*).  She identifies no other resources Schroeder "refused" to provide her.

Separately, Davis identifies several instances where Schroeder either rejected specific ideas she offered for improving the Human Resources Department or disagreed with her handling of specific personnel issues.  (*See* Doc. No. 43 at 16).  Davis says she proposed modifications to the University's "Banner system" (apparently a common Human Resources tool at American universities), but Schroeder rejected that request.  (*See* Doc. No. 36 at 74).  She also proposed expanding the use of another vendor, Intellicorp, to process the I-9 forms the University received, but Schroeder rejected that request too—though he also acknowledged that the University now uses IntelliCorp to process their I-9 forms.  (*See id.* at 116, 145-46).  As for personnel issues, Davis and Schroeder disagreed over the appropriate discipline for Carolyn Chapman, one of Davis's subordinates, and whether to give more responsibility to Dreyon Wynn, another of her subordinates.  (*See id.* at 55, Doc. No. 38 at 66).

Other than the proposal to use IntelliCorp, none of these disputes relate to the University's proffered reason for firing her: that a cascading series of problems in Davis's department demonstrated, over the course of 18 months, that she was not fit to handle the modernization effort demanded by the University's interim president.  (*See* Doc. No. 38 at 57-58).  And while the University now uses IntelliCorp, as Davis initially suggested, Davis does not attempt to explain how

16

the University's belated implementation of this single suggestion creates a genuine dispute of fact as to pretext. (*See* Doc. No. 43 at 14-18).

Davis suggests that her struggle to obtain resources and Schroder's rejection of her suggestions, taken together, show a pattern of behavior designed to sabotage her performance. But there is no evidence of a "deliberate attempt to 'build a file'" on Davis by singling her out for unduly negative treatment. *Oldham v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 124 F.3d 198 at *4 (6th Cir. 1997) (unpublished table decision) (distinguishing *Few v. Yellow Freight System, Inc.*, 845 F.2d 123 (6th Cir. 1988)). Instead, at most, Davis has presented evidence she lacked the budget she needed and clashed with her supervisor over some of her decisions and ideas. This is not sufficient evidence Schroeder wanted to fire her because of her race and sabotaged her job performance "to justify [his] decision post-hoc." *Amos v. McNairy Cnty*, 622 F. App'x 529, 540 (6th Cir. 2015).

The final pieces of evidence Davis identifies as relevant to her first pretext argument are the terminations of two other African Americans who worked in the Human Resources department: Wynn and Chapman. (*See* Doc. No. 43 at 15). "[E]vidence of discrimination by the employer against non-party employees" can be probative of pretext under some circumstances. *Griffin v. Finkbeiner*, 689 F.3d 584, 598 (6th Cir. 2012) (abrogation on other grounds recognized by *A.K. ex rel. Kocher v. Durham Sch. Servs., L.P.*, 969 F.3d 625, 630 (6th Cir. 2020)). But "[w]hether such evidence is relevant is a case-by-case determination" depending, among other factors, on "[w]hether the same actors are involved in each decision . . . temporal and geographical proximity, whether the various decisionmakers knew of the other decisions, whether the employees were similarly situated in relevant respects, or the nature of each employee's allegations." *Griffin*, 689 F.3d at 599 (citing *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008)).

Davis points to no evidence regarding any of these factors. Her sole argument is that because Wynn and Chapman were both African American and were both employees in the Human

Resources department before they were terminated, their firings are evidence of a pattern of race discrimination in employment.  (*See* Doc. No. 43 at 18-19).  These bare assertions, without more, do not create a genuine dispute of fact as to pretext.  *See Johnson v. Interstate Brands Corp.*, 351 F. App'x 36, 41 (6th Cir. 2009) ("plaintiff's assertion that other employees might be able to establish a *prima facie* case" is not enough, by itself, to show pretext).  In all, Davis's first pretext theory fails because the evidence she identifies "does not cast doubt on [her employer's] justification" for terminating her, "which finds support throughout the record."  *Giron v. Tyco Electronics Corp.*, 762 F. App'x 233, 240 (6th Cir. 2019).

### 2.  "Similarly Situated" Theory

Second, Davis argues that her performance issues were insufficient to motivate her termination because Schroeder treated the inadequate performance of a Caucasian employee more leniently than he treated Davis's. [2]  (Doc. No. 43 at 18-19); *see Briggs*, 11 F.4th at 515. Specifically, Davis argues she should have been placed on a performance improvement plan like Cutri rather than fired outright.  (*See* Doc. No. 43 at 18-19).

In order for the University's differential use of progressive discipline to be evidence of pretext, Davis must identify a "similarly situated employee," outside the protected class, "who received a more lenient reprimand despite engaging in 'substantially identical conduct.'"  *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 255 (6th Cir. 2023) (quoting *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 893 (6th Cir. 2020)).  Davis must be "similar to her proposed comparator in 'all relevant respects.'"  *Miles*, 946 F.3d at 893 (quoting *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012) (*abrogation on other grounds* recognized by *Rembert v. Swagelok Co.*, No. 22-3554, 2023 WL 3094546 (6th Cir. Apr. 26, 2023))).  While a plaintiff need not show an exact match, a proposed

---

[2]  In passing, Davis mentions two other employees: Terrie Kovacs and Lisa Simpson.  (*See* Doc. No. 43 at 16).  She makes no sustained argument as to why comparison to either employee might help her demonstrate pretext.  Accordingly, I consider only her argument related to Cutri.

comparator typically "'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Miles*, 946 F.3d at 893 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Cutri, who is Caucasian, held a position comparable to Davis's because he ran a University department and reported to Schroeder, and he is arguably subject to the same standards because he, like Davis, was held responsible for problems that existed within his Department more generally. (*See* Doc. No. 38-13). But Davis cannot show Schroeder treated her more harshly than it treated Cutri given the differences between Cutri's conduct and hers. *See Miles*, 946 F.3d at 893.

To start, Davis's argument stumbles because it relies too narrowly on the procedural vehicle of a performance improvement plan. As an "unclassified at-will" civil service employee under Ohio law, Davis had no right to any particular form of progressive discipline. *See Kyle-Eiland v. Neff*, 408 F. App'x 933, 935 n.2 (6th Cir. 2011) and *Christophel v. Kukulinsky*, 61 F.3d 479, 482 (6th Cir. 1995). As the University's Corrective Action Policy makes clear, at-will employees like Davis "may be subject to progressive discipline *at the discretion of the University*," and they also may be "suspended or terminated for cause *at its sole discretion*." (Doc. No. 38-15 at 3) (emphasis added). So, Davis has not shown that the University had a formal "progressive discipline policy" with respect to at-will employees.

Further, while the "failure to uniformly apply" progressive discipline can be evidence of pretext, Davis points to no evidence the University usually used performance improvement plans with at-will employees similar to her. *Miles*, 946 F.3d at 896; (*see* Doc. No. 43 at 18-19). Instead, Schroeder's choice to use a performance improvement plan with Cutri but not Davis was "within [the] discretion provided by the policy." *Miles*, 946 F.3d at 897.

Of course, this does not mean the University may hold African American employees and non-African American employees to different standards of behavior. But providing feedback or criticism to different employees through different avenues is not evidence of pretext in itself. Instead, as long as Davis was given a comparable opportunity to correct any shortcomings, like Cutri was, Schroeder's treatment of Cutri is not evidence of pretext. *See Koracevic v. Am. Int'l Foods*, Case No. 22-1675, 2023 WL 3756063 at *7 (6th Cir. June 1, 2023) (finding the failure to apply progressive discipline did not demonstrate pretext where the supervisor "repeatedly brought his concerns with [the employee's] work performance to her attention"). The undisputed record evidence demonstrates both that Davis's problems exceeded Cutri's, and that Schroeder provided her with a comparable opportunity to remedy those inadequacies.

Cutri was given 60 days to cure the deficiencies in the IA Department's performance that caused it to fail the external Quality Assessment Review. (*See* Doc. No. 38-13 at 1). As Schroeder explained in his deposition, this meant developing the capacity for auditing "beyond just academic and clinical . . . and look at UTPCF and its subsidiaries as well." (Doc. No. 38 at 170). According to Cutri's PIP, he and Schroeder were to meet "biweekly" for 60 days to discuss his progress. (Doc. No. 38-13 at 1). In Schroeder's assessment—which Davis does not dispute—Cutri "ended up working through the PIP in a very efficient manner, and, therefore, a termination was not needed. Everything was cured." (*Id.* at 171; *see* Doc. No. 43 at 14-19).

In contrast, many of the issues in the Human Resources Department that Schroeder identified predated his accession to the Executive VP for Finance role, and he worked with Davis over the course of a year and a half to try to solve them. Davis herself testified that she was "hesitant" to take the CHRO offer initially because she knew, going in, that "the work that needed to be done was pretty massive" and "that was going to be my responsibility in taking on that role." (Doc. No. 37 at 82). So, it is undisputed that Davis knew about the chronic deficiencies in the

Human Resources Department when she became CHRO, and it is undisputed that she expected to be responsible for fixing those issues.

After Schroeder began supervising her, Davis met with Schroeder one-on-one "every two weeks." (Doc. No. 38 at 59, 61). Over the course of those "18 months or so working directly with" Schroeder "to try and cure some of those issues," the following occurred. (Doc. No. 38 at 62). First, in August of 2019, the internal I-9 audit revealed that the University may have failed to collect between 20% and 32% of I-9 forms, potentially exposing it to millions of dollars in penalties. (*See* Doc. No. 36-14 at 2). And despite her argument in her briefing that responsibility for failing to collect I-9s lay elsewhere, she herself testified that "the responsibility" for collecting and processing I-9 forms "really was going to end up lying on HR's plate." (Doc. No. 36 at 146).

Next, in late March of 2020, Schroeder identified repeated issues with the tentative collective bargaining agreement for the University's security services. (*See* Doc. No. 38 at 67). The first tentative agreement, signed by Lisa Simpson, had resulted in "more than what the University wanted to pay," because Simpson had failed to "do[] the figures" on exactly how much the agreement would cost the University. (Doc. No. 38 at 190, 192). But even after Davis's team went back to the bargaining table, the resulting tentative agreement exceeded "[t]he parameters that . . . were given" Davis and her team for how much the agreement should cost. (*Id.* at 196; *see* Docs. No. 36-8 and 36-9). Davis admitted that she "probably" bore responsibility for at least Simpson's initial error because "she was a part of HR, and I'm over HR." (Doc. No. 36 at 200). The CHRO is responsible for "policies touching . . . labor and employee relations." (Doc. No. 36-4 at 1).

In early July of 2020, the internal audit of the University's FMLA compliance—while less troubling than the I-9 audit—nevertheless revealed deficiencies in "internal controls" and identified eight areas in need of improvement, including several deficient practices that put the University at risk of FMLA noncompliance with respect to fitness-for-duty certifications and maternity leave.

(Doc. No. 36-15 at 2-4).  "[E]mployee disability and leave administration," too, is within the CHRO's bailiwick.  (Doc. No. 36-4 at 1).

A little over a week after the audit, on July 14, 2020, Rick Swaine, the CEO of UTMC, met with Davis and Chapman to address a "significant" decrease in applicants for open positions in the hospital, which, at the time, was struggling with a 10% vacancy rate.  (Doc. No. 36 at 184-86; Doc. No. 36-7).  A few weeks after that, in early August, the leadership at UTMC again expressed frustration with the Human Resources Department's tardy posting and filling of open positions.  (Doc. No. 36-18; *see* Doc. No. 36-17; Doc. No. 36 at 98).  The CHRO is responsible for "recruitment and employment services."  (Doc. No. 36-4 at 1).

Finally, later in August, Schroeder received feedback from Brian Pack, a former Human Resources employee who had reported directly to Davis, citing Davis's lack of "flexibility" and "respect" as contributing to Pack's decision to leave the University.  (Doc. No. 36-19).  This, too, was part of an ongoing trend: four out of seven of Davis's direct subordinates resigned in a 13-month period, and they cited issues with Davis's leadership and management in doing so.  (*See* Doc. No. 38 at 89-92; Doc. No. 38-4 at 3).  Schroeder was "entitled to rely on this information" in making his decision that Davis should be fired.  *Chen v. Dow Chemical Co.*, 580 F.3d 394, 401 (6th Cir. 2009).

In summary, Cutri was given 60 days to fix a failed external audit, and he did so.  Davis was given 18 months to make progress on issues related to I-9 and FMLA compliance, the filling of open positions, and the retention of employees.  Instead, the internal I-9 audit showed significant deficiencies with I-9 collection, the FMLA audit documented numerous areas for improvement, her labor relations team submitted two tentative collective bargaining agreements that exceeded the University's cost parameters, 10% of the hospital's positions remained unfilled, and her own Department lost a significant chunk of management-level employees.  The CHRO is responsible for

all of these issue areas.  Given the substantial differences between the problems Davis was asked to fix and the problems Cutri was asked to fix, and given the issues that persisted during the 18 months Schroeder oversaw Davis, I conclude Davis and Cutri are not similarly situated because they did not engage in "substantially identical conduct" for which Schroeder treated them differently.  *Miles*, 946 F.3d at 893.

Finally, Davis cites several other facts surrounding the timeline of her termination as evidence of pretext.  She asserts that because she never received a performance review in 2020, "[t]here is no documentation regarding poor performance."  (Doc. No. 43 at 14).  There is, unfortunately, no evidence in the record to explain why Davis never received a performance review in 2020; Davis does not know, and Schroeder could not say.  (Doc. No. 38 at 63-65; Doc. No. 36 at 139-40).  But as explained above, there is ample evidence that Davis's performance as CHRO was not adequate given the problems the Department undisputedly faced and the emphasis Postel placed on modernizing Human Resources at the University.

Davis also argues the hiring of Hurst and Elliott—each of whom made more than she did— undercuts the University's reliance on budget constraints as a background factor informing the resources she received while CHRO.  (*See* Doc. No. 43 at 17).  Viewing the record in Davis's favor, this decision is not consistent with the University's stated budget problems.  But the University does not claim it fired Davis for budgetary reasons; it says it did so because of the adequacy of her leadership as CHRO.  So, this fact does not create a pretext issue either.

In all, Davis has failed to show a genuine dispute of fact as to pretext.  She has not shown the University's stated reason for firing her did not motivate that decision because she has not pointed to evidence Schroeder sabotaged her job performance. And she has not shown her job performance was insufficient to motivate her termination because the employee she points to as a comparator, Cutri, is not similarly situated to her in all relevant respects.  She has offered no other

evidence of pretext. Because Davis has failed to show there is a genuine dispute that the University's proffered reason for firing her was a pretext for discrimination based on her race, I grant the University's motion for summary judgment on Davis's Title VII race discrimination claim in Count 1.

### B.   TITLE VII RETALIATION

The University argues it should be granted summary judgment on Davis's Title VII retaliation claim for three reasons: because she failed to exhaust her administrative remedies with respect to this claim, because she did not engage in any protected activity, and because she cannot show pretext. (*See* Doc. No. 39 at 24-28). Davis opposes each of these arguments and argues the retaliation claim should survive. (*See* Doc. No. 43 at 19-20). Because I conclude Davis has failed to exhaust her administrative remedies with respect to her Title VII retaliation claim, I do not reach the University's other arguments.

An employee who seeks to bring a claim under Title VII must first file an administrative charge with the EEOC or the state's equivalent employment discrimination agency. *Younis v. Pinnacle Airlines*, 610 F.3d 359, 361 (6th Cir. 2010); *see* 42 U.S.C. § 2000e-5(f). "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in [the administrative] charge." *Younis*, 610 F.3d at 361 (citations omitted). This includes "retaliation claims based on conduct that occurred before a charge is filed," as Davis alleges here. *Spengler v. Worthingon Cylinders*, 615 F.3d 481, 489 (6th Cir. 2010). Title VII's exhaustion requirement serves two aims: to "giv[e] the employer information concerning the conduct about which the employee complains," and to give the parties "an opportunity to settle the dispute through conference, conciliation, and persuasion." *Younis*, 610 F.3d at 361 (citations omitted).

A plaintiff's claims can clear this administrative hurdle in two ways. First, if a "liberally construe[d]" administrative charge itself asserts a claim or if the charge narrative "allege[s] sufficient

facts . . . to put the EEOC on notice" of a claim, that claim may be heard in court.  *Spengler*, 615 F.3d at 490.

Second, a claim not actually included in the plaintiff's administrative charge is deemed administratively exhausted if it nevertheless falls within "the scope of the . . . investigation reasonably expected to grow out of the charge of discrimination."  *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998) (citations and quotation marks omitted).  This "expanded rule" for administrative exhaustion accounts for the fact that administrative charges "are frequently filed by lay complainants" and ought not be expected to conform to the "procedural technicalities" or "'exact wording . . . required in a judicial pleading.'"  *Id.* (citations omitted).  The "scope of investigation" test also allows claims to proceed if "the . . . investigation of one charge *in fact* reveals evidence of a different type of discrimination against the plaintiff," such when the "true basis of discrimination" is a different protected trait than the one asserted in the charge.  *Id.* (emphasis in original).

Neither pathway allows for the administrative exhaustion of Davis's Title VII retaliation claim.  Davis's first OCRC charges checks the boxes next to "Race/Color" and "Sex," and the amended charge added only "Age."  (*See* Doc. No. 37-1 at 1; Doc. No. 37-2 at 1).  In her initial charge, she asserted she was subjected to "Different terms and conditions of employment," "Discharge/Termination," and "Hostile Work Environment."  (*Id.* at 2).  In her amended charge, she asserts the "type[s] of discrimination" were "Discharge/Termination" and "Terms and Conditions (budget cuts, refused recommendations for restructuring)."  (Doc. No. 37-2 at 1).  Her narrative statement for the initial charge reads as follows:

> As an African Wom[a]n, I am subjected to the culture of systemic racism, job sabotage, excessive scrutiny, and disparate treatment in my role as AVP & Chief Human Resources Officer (CHRO) at the University of Toledo by my direct supervisor Matthew Schroeder (EVP for Finance & Administration/CFO) due to my race and sex.
> []

April 2020, $589,000 was cut from my departmental budget by Mr. Schroeder, HR
positions were eliminated and my recommendations for departmental restructuring
to improve efficiency and retention were rejected numerous times to hinder
progress. However, Caucasian male counterparts were recently given budget
increases to hire employees.
[]
August 20, 2020, Mr. Schroeder notified me that a Caucasian Consultant from
outside of the organization was coming under the guise to audit the HR function.
Mr. Schroeder first stated the Consultant would report to me as an Executive
Director of Talent, Strategy & Development but later revealed this Consultant would
replace me as the Chief Human Resources. Officer and that I would be responsible
for onboarding and transitioning them into their new role.
[]
September 18, 2020, I met with Mr. Schroeder and received a 90-day termination
noti[ce.]
(Doc. No. 37-1 at 3)

Her narrative statement for the amended charge reads:

1. I am an African American female person who is 54 years of age. I was employed
by Respondent since April 13, 2015, most recently as AVP/Chief Human Resources
Officer. I was subjected to different terms and conditions regarding my
recommendations being rejected. In April of 2020, my department was subjected to
budget cuts. On August 20, 2020, I was informed of an audit [] to be performed by a
consultant. On September 18, 2020, I received a 90-day termination notice.

2. Respondent gave me no reason for its actions.

3. I believe that I have been unlawfully discriminated against with regard to different
terms and conditions due to my race and sex because:
     a. I am the only African American female person in Human Resources.
     b. My department's budget was cut and my recommendations for
     restructuring were rejected numerous times.
     c. Caucasian and/or male counterparts were given budget increases for their
     departments.

4. I believe that I have been unlawfully discriminated against with regard to my
termination due to my race, sex, and age because:
     a. I was born on August 23, 1966
     b. On August 2020, I was informed an audit would be performed by an
     outside agency.
     c. I was informed the consultant would report to me but later on, I was
     informed the Consultant would be replacing me.
     d. I received a 90-day notice of termination on September 18, 2020 and was
     replaced by a Caucasian male person (John Elliott) and a Caucasian female
     person (Melissa Hurst). Ms. Hurst is significantly younger than I am.
(Doc. No. 37-2).

Davis does not argue her OCRC charges themselves, even liberally construed, included a retaliation claim.  (*See* Doc. No. 43 at 19-20).  And they did not.  She did not check the box next to "Retaliation" in either charge.  (*See* Doc. No. 37-1 at 1, Doc. No. 37-2).  Her narrative in the initial charge focused on "the culture of systemic racism, job sabotage, excessive scrutiny, and disparate treatment" she allegedly endured "due to my race and sex."  (Doc. No. 37-1 at 1, 3).  Her narrative in the amended charge similarly focused on departmental "budget . . . cut[s]" and the rejection of her "recommendations for restructuring" as manifesting the University's discrimination "due to my race and sex," and it also pointed to her termination and replacement by Hurst and Elliott as discrimination based on "race, sex, and age."  (Doc. No. 37-2).

This is not a case where the narrative of a charge "clearly sets forth a retaliation claim," such as by referring to protected activity and describing a decisionmaker's retaliatory motive.  *Spengler*, 615 F.3d 481, 490 (finding that the plaintiff's retaliation claim was properly exhausted because the narrative asserted the plaintiff's supervisor "resented" the plaintiff's complaint of discriminatory treatment and harbored a "personal vendetta" against the plaintiff thereafter).  Instead, Davis's OCRC charge straightforwardly asserts she was discriminated against because she is a woman and because she is African American—nothing more.  *Cf. Crowder v. Railcrew Xpress*, 557 F. App'x 487, 492 (6th Cir. 2014) (finding that the plaintiff's retaliation claim was not included in her charge because she alleged she was retaliated against for "complaining about her pay" but not for complaining about "discriminatory pay").

Davis instead argues she has exhausted her administrative remedies with respect to her retaliation claim because that claim reasonably could be expected to grow out of the OCRC's investigation of her two administrative charges.  (Doc. No. 43 at 19) (citing *Davis*, 157 F.3d at 463).  But as I explained, Davis's OCRC charges include no reference to retaliation whatsoever.  She does

not discuss any protected activity, she does not refer to a retaliatory motive, and she does not expressly assert "retaliation" as a basis for her charge.

Further, there is no evidence the OCRC actually investigated any retaliation claim.  In its letter of determination, it made findings of fact related to Davis's "alleg[ations] that she was subjected to different terms and conditions regarding her recommendations for restructuring being consistently rejected, departmental budget cuts and subsequently terminated based on her race, sex, and age."  (Doc. No. 37-3 at 1).  The letter drew conclusions of law only with respect to "different terms and conditions and termination on the basis of race" and "different terms and conditions . . . on the basis of age and sex."  (*Id.* at 3).

Faced with two administrative charges that do not refer to retaliation and an OCRC investigation that did not actually encompass a retaliation claim, Davis points to her OCRC position statements, where, she says, "the allegation of retaliation was raised twice."  (Doc. No. 43 at 17).  The bulk of Davis's 9-page position statement, submitted in response to the University's position statement, discusses discrimination on the basis of race and sex.  (*See* Doc. No. 43-2).  But two paragraphs do refer to alleged retaliation against her by Schroeder.  (*See id.* at 5–6).

Even so, Davis cites no case standing for the proposition that a plaintiff's position statement submitted during an OCRC (or EEOC) investigation can administratively exhaust a claim not otherwise raised in either of her administrative charges or actually pursued by the OCRC.  (*See* Doc. No. 43 at 17–18).  Several district courts in this Circuit have rejected this argument.  *See Powell v. Baptist Memorial Hosp.*, No. 2:20-cv-02856, 2023 WL 3000956 at *8 (W.D. Tenn. Feb. 22, 2023) (*report and recommendation adopted by* 2023 WL 2994125); *Tobias v. Terex, USA Inc.*, Case No. 20-13333, 2022 WL 3686423 at *9 (E.D. Mich. Aug. 25, 2022).  The Tenth Circuit has as well.  *See, e.g.*, *Delsa Brooke Sanderson v. Wyoming Highway Patrol*, 976 F.3d 1164, 1171 (10th Cir. 2020).  I conclude there are good reason to reject it in Davis's case.

To start, like in *Powell*, there is no evidence the University ever saw Davis's position statement or its references to retaliation.  *See Powell*, 2023 WL 3000956 at *9.  Davis submitted her position statement *in response* to the University's statement, and the document itself indicates she submitted it to the OCRC, not to the University.  (*See* Doc. No. 43-2 at 2).  So, there is no evidence the position statement informed the University of "the conduct about which the employee complains" with respect to the alleged retaliation.  *Younis*, 610 F.3d at 361.

Relatedly, Davis's position statement referred to retaliation only twice, and it did so in a conclusory fashion *after* any initial mediation would have taken place.  *See* Investigation Process, Ohio Civil Rights Commission (available at https://civ.ohio.gov/how-to-file-a-charge/investigation-process) (last accessed March 4, 2025) (explaining that the complainant submits their position statement after any mediation and after the respondent files their position statement).  Davis's statement, like the administrative charges themselves, focused almost entirely on her race and sex discrimination claims, and those claims were likewise the focus of OCRC's investigation.  (*See* Doc. No. 43-2; Doc. No. 37-3).

Therefore, any allegations of retaliation could not reasonably have been expected to come up in the OCRC's "conference, conciliation, and persuasion" process either.  *Id.*  Finally, Davis's lengthy and detailed position statement was submitted on her behalf by counsel (Doc. No. 43-2 at 9), so the more generous construction given to administrative charges drafted by "lay complainants" is not appropriate here.  *Davis*, 157 F.3d at 463.

These three considerations—informing the employer of the complained-of conduct, encouraging compliance with anti-discrimination laws without the need for court intervention, and treating *pro se* complainants with the appropriate solicitude—undergird the Title VII administrative exhaustion regime.  *See, e.g., Younis*, 610 F.3d at 361-62; *Spengler*, 615 F.3d at 489-90; *Davis*, 157 F.3d at 463-64.  It would serve none of those considerations to find Davis's retaliation claim

administratively exhausted here.  Davis's administrative charges made no reference to retaliation, the OCRC did not investigate retaliation, and nothing in the record otherwise indicates a retaliation claim was reasonably within the expected scope of the OCRC's investigation.  As the Sixth Circuit explained in *Davis*, the "expected scope of investigation" rule "does not mean . . . that plaintiffs are excused from filing charges on a particular discrimination claim before suing in federal court."  157 F.3d at 463.  Because Davis has failed to administratively exhaust her Title VII retaliation claim in Count 2, I grant the University's motion for summary judgment with respect to that claim.

### V.    CONCLUSION

For the reasons stated above, I grant Defendant University of Toledo's motion for summary judgment.  (Doc. No. 39).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge